IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 8:09CR272 |
| vs. ) | |
| ) | FINDINGS AND |
| SHANNON B. JACKSON and ) | RECOMMENDATION |
| MICHAEL D. McCROY, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on the motions to suppress statements and witness identification (Filings 65 & 67) filed by Shannon B. Jackson ("Jackson"), together with Michael D. McCroy's ("McCroy") motion to suppress the statements of Shannon Jackson (Filing 57). An evidentiary hearing was held on January 21, 2010 (Transcript, Filings 111 & 112). The motions were deemed submitted on February 12, 2010, upon the filing of the government's supplemental brief (Filing 110).

I recommend that the motions be denied.

Both defendants are charged with conspiracy to commit bank robbery (Count I), Bank robbery (Count II), and carrying and brandishing a firearm during a bank robbery (Count III) as to the March 13, 2009 robbery of the First National Bank in Bellevue, Nebraska. Jackson is charged in Counts III and IV with bank robbery and brandishing a firearm during the October 30, 2008 robbery of TierOne Bank in Omaha, Nebraska.

Jackson alleges that he was interrogated after his arrest, in violation of his Fifth Amendment right against self-incrimination and the right to an attorney, and that telephone

calls he made from the Sarpy County Jail were unlawfully intercepted. (Filing 65). He further alleges that a bank teller's identification of him on March 13, 2009 should be suppressed because this identification "was impermissibly suggestive."

## I.  FACTUAL BACKGROUND

### A.  Motions to Suppress Statements

David Brewer is a 14-year veteran of the Bellevue, Nebraska Police Department, currently assigned as a road patrol officer. He has been in law enforcement for 30 years. On the morning of March 13, 2009, Brewer was on duty in a marked cruiser. At 7:05 a.m., Brewer received a radio call regarding the burglary at the First National Bank. Brewer, who was patrolling about two miles north of the bank, served as part of a "perimeter group." He responded to the radio call, driving southbound for about four minutes and stopping in the vicinity of 25th and Georgia Streets, which is about one mile north of the bank and approximately three blocks away from a creek and a tree line. He saw no movements other than other officers who were on the perimeter.

Brewer explained on cross-examination that one of the two suspected bank robbers, i.e., defendant McCroy, had been apprehended near the bank almost immediately. The arresting officer advised that a second outstanding party was running northbound, towards Brewer's location, putting him in line with the creek and tree line. Brewer was watching for this individual. (*See* Filing 112, 31:1-32:7).

At about 7:35 a.m. (Filing 112, 27:10), one of the other perimeter officers reported seeing some type of movement in the creek and tree line area. Brewer moved about two and one-half blocks to the east, to within 100 years of the creek. As Brewer pulled up, between 7:37 and 7:40 a.m. (27:16-17), there were several officers from the Sarpy County Sheriff's department and one uniformed officer from the Bellevue Police Department exiting the creek area. They were escorting one individual, Shannon Jackson, who was in handcuffs. Jackson was wearing dark blue jeans, black tennis shoes, a soft black hat and two T-shirts (Filing 112, 32:16-19); however, the weather on March 13, 2009 was cold. Brewer described Jackson's clothes as being "somewhere between wet and soaked." (Filing 112, 11:2).

Officer Brewer offered to take custody of Jackson, since he had the only police cruiser in the area. Brewer stood by as a Sarpy County deputy pat-searched Jackson, who was then placed inside Brewer's vehicle. Brewer got into the front seat and briefly asked Jackson if he was okay. Jackson responded that he would be okay, and he refused medical attention. Jackson said he was cold and wet and asked Brewer to turn the heat on. Brewer turned the heat up on high and opened the sliding window to allow warm air to flow into the prisoner area. Brewer then exited the cruiser for about five minutes to speak to the other officers.

Officer Brewer returned to the cruiser, introduced himself by name, and obtained Jackson's permission to complete a field interview card. The card was not offered in evidence. Brewer explained that a field interview card "contains the basic personal information of an individual such as their name, address, height, weight, *et cetera*, place of

employment."  (Filing 112, 12:10-12).   The front side of the card includes the date, the location of the contact, the individual's name, his date of birth, his address, any vehicle information if there was a vehicle present."  (Filing 112, 12:25-13:4).

According to Brewer, Jackson was cooperative, answering every question. Brewer completed the front side of the card.  As he was preparing to complete the other side of the card, Jackson stated:  "I should have known better than to let that fool talk me into coming down here."  Brewer testified he did not ask Jackson any questions in order to elicit that statement.  Officer Brewer then reminded Jackson that he was under arrest, at which point Jackson replied he knew that, or he wouldn't be in handcuffs in the back of a police car.

Officer Brewer then read Jackson his *Miranda* rights, using a *Miranda* rights advisory card.  They then completed some more of the field interview card, and Brewer asked Jackson about the vehicle he used to get to the Bellevue location.  Jackson stated he believed he was asleep for most of the trip down and suggested he thought it might have been a pickup truck that was used for transportation.  Brewer asked Jackson to be more specific and asked about the color of the vehicle.  Jackson responded that he thought he had said enough and would like to see his lawyer.  All questioning ceased at that time.  The cruiser was not equipped with recording equipment, and the conversation was not recorded. (Filing 112, 29:14-30:3).

At the request of Lieutenant Stuckenholz, Brewer transported Jackson back to the First National Bank, which was less than one mile away from where Brewer was parked near the creek bed.  Brewer parked the cruiser in the bank parking lot, exited, and talked to

Lieutenant Stuckenholz. At Stuckenholz' direction, Brewer returned to the cruiser, opened the left rear passenger door and asked Jackson to step out, which he did. Brewer then asked Jackson to face all four directions. Jackson, who was still handcuffed, was standing between 80 and 100 feet away from the bank itself. After Jackson made a complete revolution, Stuckenholz gave Brewer an okay sign, and Brewer put Jackson back in the cruiser. Brewer testified he saw only Lieutenant Stuckenholz, and did not see a bank teller or security guard looking at Jackson.

After the "show-up" procedure was completed, Jackson was transported to the Sarpy County law enforcement center and booked in by Officer Brewer.

Jonathan Robitaille testified that he has been the FBI bank robbery coordinator since July 2008 and investigates most of the bank robberies in the Omaha metro area. According to Robitaille, the Sarpy County Jail uses a contractor that records inmates' incoming and outgoing telephone calls. Exhibits 1, 2 and 3 relate to recorded telephone calls made or received by defendant Jackson and other parties at the Sarpy County Jail. Agent Robitaille testified that he and Omaha Police Detective Matt Chandler (Filing 111, 25:7) requested a copy of the recordings of telephone calls made by defendant Jackson to other parties. They did not obtain a warrant. Sarpy County provided them with an overall call list, together with a recording of the calls.

Exhibit 2 is a disk containing five selected calls from the overall call list provided by Sarpy County. The calls were all collect calls made from the Sarpy County Jail between

March 13 and March 15, 2009 and consist of conversations between Shannon Jackson, Kimberly Williams, and Danny Reeves. There is a pre-recorded message at the beginning of each call clearly stating that the calls are subject to monitoring and recording. The receiving party is then given the option to accept the charges for the collect call and continue the conversation. This message can be heard by the inmate placing the call and by the individual who receives the call. The five telephone calls were transcribed (Exhibit 3).

Agent Robitaille also noted that inmate handbooks (*see* Exhibit 4), which include the policy on the recording of telephone calls, are taped to the wall located near all the telephones Robitaille observed at the jail (except the telephones in the intake area because the inmates kept tearing them off the wall).

Exhibit 4 is a copy of Chapter VIII of the Sarpy County inmate handbook, which applies to telephones. Paragraph I.G provides: "The Facility Administrator and/or his designee may reserve the right to monitor or record any incoming and outgoing phone calls, when it is determined that an inmate's actions/conversation pose a threat to the safety and security of the Sarpy County Law Enforcement Center."

### B. Motion to Suppress Identification

Bellevue Police Sergeant Tim Melvin testified that he has been with the Bellevue Police Department for nine years and has been a supervisor with the Criminal Investigations Bureau for three years. He responded to the March 13, 2009 bank robbery, interviewed the

bank tellers, and participated in the show-up identification procedure involving defendant Jackson.

Sergeant Melvin arrived at the bank at about 7:20 a.m., reviewed the crime scene, and spoke with bank teller Molly Coil. Ms. Coil told him that two black males came into the bank, both dressed in dark clothing, with their faces covered, and hoods over their heads. One of the robbers came to the back of the bank, where Ms. Coil was, and forced her to open the vault in the back. She said the men were approximately five feet eight inches tall and about 27 years of age. The robber who made her open the vault had thick eyebrows.

Sergeant Melvin testified he was inside the bank with Molly Coil during the show-up procedure. They observed the procedure through a window in the manager's office, about 75 to 80 feet from Jackson. When they entered the office, they looked out the window and saw Brewer standing outside his patrol car. Brewer then got Jackson out of the patrol car, and had him just standing there. Ms. Coil made her observations at that time. She did not think the person in the parking lot was the one who came to the back of the bank and made her open the vault; she believed this individual had stayed in the lobby during the robbery. She said the clothing appeared similar to the person out in the lobby, but she could not be sure. Melvin clarified on cross-examination that Coil did not think Jackson was the person who came into the back, where she was; she could not be sure that Jackson was the one in the lobby; and Ms. Coil did not positively identify Jackson as one of the two suspects.

Bellevue Police Detective Francis Gallo testified that he has been a detective for 15 years and investigated the March 13, 2009 bank robbery. He interviewed the bank's security guard, Mark Root. Mr. Root advised that he initially heard the noise of the window breaking. When he looked toward the window, he saw two men rush in. They were completely covered and wearing dark clothing. Both of them were carrying guns of some sort and one was wearing a face mask.

Detective Gallo was with Mr. Root during the show-up procedure. They observed Jackson from an office window, and Gallo asked if that was one of the two suspects. Mr. Root said he really couldn't say for sure because the robbers had their faces covered and he only saw them briefly as they rushed in; they were carrying weapons, and Root immediately hit the ground.

## II.  LEGAL ANALYSIS

### A.  Jackson's Statements to Brewer

Jackson's motion (Filing 65) alleges that he was interrogated in violation of is Fifth Amendment right against self incrimination and the right to an attorney. *Miranda v. Arizona* 384 U.S. 436 (1966). The protections of *Miranda v. Arizona* are triggered when a defendant is (1) in custody and (2) being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at

1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

The record clearly shows that all conversations between Brewer and Jackson occurred while Jackson was "in custody." Requests for routine biographical data are exempted from the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996). Here, Officer Brewer did not act unlawfully in asking Jackson if he would agree to filling out a "field interview card." The card field interview card was not offered in evidence; however, based on Officer Brewer's testimony, it appears that the items on the card included, but were not limited to, requests for "biographical" information.

The court finds credible Officer Brewer's testimony that he read Jackson his *Miranda* rights; however, there was no testimony or other evidence showing that Jackson actually agreed to waive his rights and speak to the officer without an attorney present. (*See* Filing 112, 15:8-16:7). The court further finds that Brewer's questions to Jackson concerning the "mode of transportation that brought him down to the bank area" (*see* Filing 112, 25:20) constituted custodial interrogation. Jackson's responses to those questions should be suppressed because there is no evidence that he waived his *Miranda* rights while in the custody of Officer Brewer.

That said, it does not appear that Jackson's comment that he "should have known better than to let that fool talk me into coming down here," was made in response to any

question posed by Officer Brewer. The court finds that this statement was volunteered by Jackson and was not the product of custodial interrogation.

### B. The Telephone Calls

#### 1. Shannon Jackson

In his supplemental brief (Filing 101), defendant Jackson argues that the recordings of his jail-house telephone calls should be suppressed because they were obtained in violation of federal statute. Title I of the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, Title I, 100 Stat. 1851 ("Title I")[1], regulates the interception of wire, oral and electronic communications. 18 U.S.C. § 2510-22 (2000). "Under Title I, it is not unlawful to intercept such a communication if a party to the communication has given prior consent to the interception. 18 U.S.C. § 2511(2)(c) (2000). Nor does such an interception violate the Fourth Amendment." *United States v. Corona-Chavez*, 328 F.3d 974, 978 (8th Cir. 2003) (citing *United States v. White*, 401 U.S. 745 (1971)). The government bears the burden of proving actual consent; however, the consent may be express or implied. *United States v. Corona-Chavez*, 328 F.3d at 978. "When someone voluntarily participates in a telephone conversation knowing that the call is being intercepted, this conduct supports a finding of implied consent to the interception." *United States v. Corona-Chavez*, 328 F.3d at 978 (citing *United States v. Horr,* 963 F.2d 1124, 1125 (8th Cir. 1992)).

---

[1] Title I amended Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2521.

In *United States v. Peoples*, 250 F.3d 630, 637 (8th Cir. 2001), the Eighth Circuit observed:

> The federal wiretap law defines an "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). Before the interception of a conversation can be found to constitute a search under the Fourth Amendment or an "oral communication" under the federal wiretap law, therefore, the individuals involved must show that they had a reasonable expectation of privacy in that conversation. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) ("application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action"); *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L. Ed. 2d 576 (1967) (government's surreptitious listening to and recording of telephone conversation "violated the privacy on which [petitioner] justifiably relied"); *Angel v. Williams*, 12 F.3d 786, 789-90 (8th Cir. 1993) ("oral communication" is a term of art under the federal wiretap law, referring only to communications uttered by a person reasonably expecting them to be private).

One cannot consent to the interception of telephone conversations unless given some notice that the conversations are being intercepted. In *Peoples*, the statements in question were made on an internal communications system between prisoners and visitors. The Eighth Circuit agreed that the defendants' expectations of privacy in these conversations was objectively unreasonable:

> Prison inmates necessarily have reduced privacy rights because of the nature of incarceration and the myriad of institutional needs and objectives of prison facilities. *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). We agree with the district court's conclusion that CCA had legitimate security reasons for monitoring the conversations and that the recordings were not made in an attempt to gather evidence about the robberies

-11-

or the murder. Because CCA's practice of monitoring and recording prisoner-visitor conversations was a reasonable means of achieving the legitimate institutional goal of maintaining prison security and because those conversing in a prison setting are deemed to be aware of the necessity for and the existence of such security measures, we agree with the district court that the defendants' rights were not violated by the introduction of the recordings.

250 F.3d at 637.

In *United States v. Horr*, the Eighth Circuit found that certain communications were lawfully intercepted under § 2511(2)(c) because the defendant impliedly consented to the taping of his telephone conversations while he was detained at the Federal Medical Center in Rochester, Minnesota:

> Upon entering FMC all prisoners are given an admission and orientation handbook which indicates that inmate telephone calls are monitored and recorded. Inmates are also told about this policy at orientation. Although Horr claimed at the suppression hearing that it was not his signature–testimony that the magistrate judge did not find credible–Horr signed a form indicating that he was aware of the telephone policy. Moreover, Horr testified that he had seen signs posted near the telephones which state: "The Bureau of Prisons has the authority to monitor conversations on this telephone. Your use of the institutional telephone constitutes consent to this monitoring. A properly placed telephone call to an attorney is not monitored." Horr argues that he did not consent to the taping because he had no choice concerning whether he wanted to have his calls monitored. We disagree. Horr was aware of the telephone monitoring policy. It was his choice to use the telephone to conduct his illegal business. Having gambled by discussing his escape on the prison telephone, Horr cannot now be heard to complain that he lost.

*Horr*, 963 F.2d at 1126. In view of Horr's knowledge of the Bureau of Prisons' policy of recording inmate telephone conversations, Horr had no expectation of privacy concerning the content of his telephone conversations, and the taping did not violate Horr's Fourth Amendment Rights. *Id*. at 1126 n.3. *See also United States v. Eggleston*, 165 F.3d 624 (8th

Cir.), *cert. denied*, 526 U.S. 1031 (1999) (no Fourth Amendment violation where defendant agreed to the recording and monitoring of calls made from jail).

More recently, in *United States v. Lucas*, 499 F.3d 769 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 1702 (2008), a case originating in this court, the Eighth Circuit observed:

> Lucas makes two objections relating to his conviction for attempted obstruction of justice. He argues first that the phone recordings on which the charge was based should have been excluded from evidence. Telephone calls may be intercepted without a warrant if one of the parties to the call gives "prior consent." 18 U.S.C. § 2511(2)(c). There was uncontradicted evidence at the suppression hearing that the Douglas County Corrections Center gave each inmate a handbook stating that all outgoing telephone calls were monitored except those to attorneys. The Center affixed placards to the inmate telephones warning that the calls were recorded, and an audio message repeated the warning before each call. In a similar situation in *United States v. Horr*, 963 F.2d 1124, 1126 (8th Cir. 1992), we concluded that medical center inmates had impliedly consented to the recording of their phone calls. The district court was entitled to find from the notice given to inmates that any reasonable person in Lucas's position should have known of the policy. We conclude that the district court did not abuse its discretion in admitting the recordings into evidence.

*United States v. Lucas*, 499 F.3d at 780.

The court finds that the telephones to which the defendant had access at the Sarpy County Jail were in close proximity to posted copies of Chapter VIII of the Sarpy County inmate handbook, advising that "The Facility Administrator and/or his designee may reserve the right to monitor or record any incoming and outgoing phone calls, when it is determined that an inmate's actions/conversation pose a threat to the safety and security of the Sarpy County Law Enforcement Center." While the admonition does not warn that all telephone

calls are monitored or recorded, it would tend to reduce a reasonable person's expectation of privacy in using those telephones.

The recordings in Exhibit 2, however, demonstrate that the defendant was actually advised that his each of his telephone conversations would be monitored and recorded. Knowing that his conversations would be monitored and recorded, the defendant elected to use the telephone and continue with his various conversations. Any reasonable person in Jackson's position should have known, before engaging in the conversation, that the conversation would be recorded. I find that defendant Jackson impliedly consented to the monitoring and recording of his outgoing telephone calls.

### 2. Michael McCroy

McCroy alleges that Jackson's telephone conversations should be suppressed because any alleged conspiracy between McCroy and Jackson "ceased upon the arrest of Mr. Jackson following the Indictment in question." Thus, Jackson's statements are not statements of a co-conspirator during the course of the conspiracy and are not admissible under Fed. R. Evid. 801(d)(2)(E). It is also argued that offering Jackson's statements at trial would violate McCroy's "rights to confront his accusers under the Sixth Amendment to the United States Constitution" if Jackson does not testify at trial. (Filing 57 at p. 14-15/16).

McCroy's theories all present substantive issues of law, but were not briefed. Pursuant to NECrimR 12.3(b)(1), the court may treat a party's failure to simultaneously file a brief as an abandonment of the motion. A party's failure to brief an issue raised in a motion may be

considered a waiver of that issue. The court finds that defendant McCroy has abandoned and waived the issues raised in his Motion to Suppress Statements (Filing 57).

### C. Jackson's Motion to Suppress Witness Identification

Defendant Jackson alleges the show-up identification violated his procedural due process rights because the procedure used was unduly suggestive and unreliable. *See generally United States v. Jones*, 535 F.3d 886 (8th Cir. 2008). "While showups are 'the most suggestive, and therefore the most objectionable method of pre-trial identification,' ... whether or not they are impermissibly suggestive depends on the circumstances surrounding their use." *United States v. Henderson*, 719 F.2d 934, 937 (8th Cir. 1983) (citing *United States v. Cook*, 464 F.2d 251, 253 (8th Cir.), *cert. denied,* 409 U.S. 1011 (1972)).

Jackson's motion and brief do not advance a clear argument as to why the show-up procedure employed in this instance was unduly suggestive and unreliable. During oral argument (*see* Filing 111, 3:17-6:18), counsel stated that Jackson was trying to suppress the identification as "impermissively suggestive of a substantial likelihood of irreparable misidentification." Jackson suggested that the robbers' clothing as depicted on the security surveillance recording (Exhibit 5) appeared different than the clothing Jackson was wearing at the time of the show-up; therefore, the show-up was unduly suggestive and unreliable.

An identification is unreliable "'if its circumstances create a very substantial likelihood of irreparable misidentification.'" *United States v. Jones*, 535 F.3d at 891 (quoting *United States v. Martinez*, 462 F.3d 903, 910 (8th Cir. 2006)). In this regard, the relevant

circumstances include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and confrontation. *Id.*   Here, there appears to be no witness who identified Jackson as one of the bank robbers as the result of the show-up procedure. The bank's security guard did not have a chance to observe the bank robbers, and he did not identify Jackson as one of the robbers. The bank teller stated that Jackson was not the person who made her open the vault. While he could have been the robber who stayed in the bank lobby, she could not be sure. The teller did not positively identify Jackson as one of the two suspects in the robbery.

Assuming, without deciding, that the show-up procedure was impermissibly suggestive, I conclude that the procedure did not result in a "substantial likelihood of irreparable misidentification" because the procedure did not result in any positive identification. For that reason, I will recommend that the motion be denied without prejudice to making a motion in limine or evidentiary objections, as appropriate, at the time of trial.

### III. RECOMMENDATION

For the reasons discussed above,

**IT IS RECOMMENDED:**

1. That the defendants' motions to suppress statements (Filings 65 & 57) be denied, and

2. That defendant Jackson's motion to suppress witness identification (Filing 67) be denied without prejudice to making a motion in limine or evidentiary objections, as appropriate, at the time of trial.

**DATED March 15, 2010.**

                                  **BY THE COURT:**

                                  **s/ F.A. Gossett**
                                  **United States Magistrate Judge**